Affirmed and Opinion filed May 15, 2003









Affirmed and Opinion filed May 15, 2003.

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-02-00026-CV

_______________

 

VIRGINIA HERNANDEZ FRIAS, INDIVIDUALLY, and AS NEXT
FRIEND

OF NICHOLAS BRIAN FRIAS and THOMAS ISAAC FRIAS, GEORGE
ANTHONY FRIAS, JESSE VALENTIN FRIAS, STEVEN SIMON FRIAS, CARLOS JESUS FRIAS,
CHRISTINA MEJIA, and JOSE MANUEL GALVAN, AS REPRESENTATIVE OF THE ESTATE OF
JESUS VALENTIN FRIAS, Appellants

 

V.

 

ATLANTIC RICHFIELD COMPANY, LYONDELL PETROCHEMICAL
COMPANY, and LYONDELL-CITGO REFINING COMPANY LTD., Appellees

                                                                                                                                          


On Appeal from the 270th District Court

Harris County, Texas

Trial Court Cause No. 94-38491

                                                                                                                                            


 

O P I N I O N

 

Virginia Hernandez Frias, individually, and as next friend of
Nicholas Brian Frias and Thomas Isaac Frias, George Anthony Frias, Jesse
Valentin Frias, Steven Simon Frias, Carlos Jesus Frias, Christina Mejia, and
Jose Manuel Galvan, as representative of the Estate of Jesus Valentin Frias
(collectively, the AFriases@) appeal a no-evidence summary judgment granted in favor of
Atlantic Richfield Company, Lyondell Petrochemical Company, and Lyondell-Citgo
Refining Company Ltd.  We affirm.

Background








The Friases sued appellees alleging that Jesus Frias (AJesus@) died of aplastic anemia caused by
exposure to benzene containing products at the refinery (the Arefinery@) where he was employed by appellees
successively from 1974 to 1994.  Appellees filed a motion for summary judgment
asserting, among other things, that there was no evidence that: (1) the levels of benzene to
which Jesus was allegedly exposed were sufficient to cause his death from
aplastic anemia; or (2) exposure to benzene under circumstances similar to those
allegedly experienced by Jesus causes aplastic anemia.[1]  The Friases filed a summary judgment response
containing affidavits of expert witnesses who concluded that  Jesus was exposed to enough benzene at the
refinery to cause his aplastic anemia. 
Appellees then filed a reply to the response contending that the Friases= expert affidavits were no evidence
of causation because they did not contain scientifically reliable and legally
sufficient expert evidence.  The
trial court granted the summary judgment without specifying the ground(s) upon
which its decision was based.

Standards of Review

                                                             Summary
Judgment








A
no-evidence motion for summary judgment must be granted if: (1) the moving
party asserts that there is no evidence of one or more specified elements of a
claim or defense on which the adverse party would have the burden of proof at
trial; and (2) the respondent produces no summary judgment evidence raising a
genuine issue of material fact on those elements.  See Tex.
R. Civ. P. 166a(i).  In reviewing
a no-evidence summary judgment, we review the record in the light most
favorable to the nonmovant to determine whether more than a scintilla of
evidence was presented on the challenged elements of the nonmovant=s claim.  See Wal-Mart Stores, Inc. v. Rodriguez,
92 S.W.3d 502, 506 (Tex. 2002).  When a trial court's order granting a no
evidence summary judgment does not specify the ground(s) relied upon for its
ruling, the summary judgment will be affirmed if any of the theories advanced
are meritorious.  Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 242 (Tex. 2001).

                                                               Expert
Testimony

In order to be admissible into evidence, an
expert witness=s
testimony must, among other things, be reliable.  Exxon Pipeline Co. v. Zwahr, 88 S.W.3d
623, 628B29
(Tex. 2002).  Expert testimony is
unreliable if: (1) it is not grounded in the methods and procedures of science
and is thus no more than subjective belief or unsupported speculation; or (2)
there is too great an analytical gap between the data upon which the expert
relies and the opinion he offers.  Id.
at 629.  The purpose of the reliability
determination is not to decide whether the expert=s conclusions are correct,
but only whether the analysis used to reach them is reliable.  Id.

A party may object to the reliability of
expert testimony either before trial or when it is offered.  See Guadalupe-Blanco River Auth. v. Kraft,
77 S.W.3d 805, 807 (Tex. 2002).  Once
such an objection is made, the burden is on the proponent of the evidence to
establish its reliability.  See id.  A trial court=s decision whether to admit
expert testimony is reviewed for abuse of discretion.  Id. 
If the ground for excluding such evidence is not specified by the trial
court, the ruling will be upheld if any ground is meritorious.  See K-Mart Corp. v. Honeycutt, 24
S.W.3d 357, 360 (Tex. 2000).  In addition
to being a determinant of the admissibility of such evidence, the reliability
of expert testimony is also a prerequisite to its legal sufficiency.  See Merrell Dow Pharms. v. Havner, 953
S.W.2d 706, 714 (Tex. 1997).[2]








                                                          Evidence of
Causation

The Friases challenge the summary judgment
on the ground that their
expert witness testimony was reliable to establish:
(1) the range and
length of exposure to benzene necessary to cause aplastic anemia; and (2) that
Jesus=s exposure to benzene was within that
range and length.[3]

Causation
in toxic tort cases requires both general and specific causation.  See Havner, 953 S.W.2d at 714.  General causation is whether a substance is
capable of causing a particular injury or condition, while specific causation
is whether a substance actually caused a particular individual=s injury.  Id.[4]  In this regard, an unsupported expert
opinion, based only on credentials and subjective opinion, will not suffice to
prove causation.  Id. at 711-12,
720.  Rather, the reliability of the data
underlying the opinion must be independently evaluated in determining whether
the opinion is reliable.  See id.
at 713-14.








At
a minimum, to be considered reliable scientific evidence of general causation,
epidemiological studies must: (1) reflect that the risk of an injury or
condition in the exposed population is more than double that in the unexposed
or control population; and (2) have a Aconfidence level@ of 95%.[5]  Id. at 717B24. 
Moreover, an isolated study finding a statistically significant
association between a substance and a disease or condition is not legally
sufficient evidence of causation because any conclusion about causation can be
reached only after an association is observed in studies among different groups
and the association continues to hold when the effects of other variables are
taken into account.  Id. at 727.

In
this case, it is undisputed that, at some level and length of exposure, benzene
causes aplastic anemia.[6]  Therefore, the controlling issues are: (1)
whether there is scientifically reliable evidence of what that level and period
of exposure are; and, if so, (2) whether there is legally sufficient evidence
in this case that Jesus was exposed at that level for that period.  To provide evidence of these two matters,
appellants rely on the affidavits of two expert witnesses: (1) Frank Gardner, a
licensed physician, board certified internist, and medical school professor of
hematology and oncology; and (2) Vernon E. Rose, an industrial hygienist.[7]

                                                              General
Causation

Of
the two experts= affidavits, only that of Gardner addresses the level and
period of exposure to benzene that can cause aplastic anemia:

Ironically,
because the relationship between benzene exposure and aplastic anemia is so
well accepted, little work has been done to specifically delineate the levels
of exposure at which aplasia can occur. 
We do, however, have published literature that informs our view of the
exposure picture necessary to cause aplastic anemia.








8.         Early
American studies suggested that benzene exposures in excess of 350 ppm could
cause aplasia.  More recent studies
support the conclusion that repeated exposures to much lower levels can
sufficiently damage the marrow to cause aplastic anemia.  In 1987, Yin published a study that investigated
over 500,000 Chinese workers exposed to benzene.  The study concluded that individuals could
develop aplastic anemia after being regularly exposed for 4 months (118 days)
to 44 ppm of benzene.  The study
showed nearly a six-fold increase (5.8) in aplastic anemia at these levels of
exposure.  In 1989, Paci published a
similar study that examined Italian shoe workers exposed to benzene.  Unlike the Yin study, Paci=s workers were not exposed to pure
benzene but to solvents containing a high percentage of benzene (approximately
70%).  The Paci study did not report any
quantitative exposure data, but descriptions of work practices are similar to
those described by Yin.  The study showed
more than a 15-fold increase in aplastic anemia.  The Paci study support[s] the conclusion that
benzene exposure even at lower levels than those reported in the Yin study can
cause aplastic anemia.

(emphasis added)
(footnote citations omitted).

In
that Gardner=s expert opinion is based on studies
conducted by others, we must determine whether those underlying studies are
scientifically reliable to support his conclusion.  See Havner, 953 S.W.2d at 713-14.  Although Gardner refers to unspecified early
American studies, his affidavit does not indicate whether those studies
addressed the time period of exposure, no such studies are part of our record,
and we lack any other information with which to determine whether those studies
met the more than double relative risk or 95% confidence level prescribed by Havner.  See id. at 717B24.

The
Yin study, a copy of which is in our record, 
concludes that Aaplastic anemia could develop in about 118 days in workers
exposed to benzene concentrations at a level of 1035.6 mg/m.@[8] 
This conclusion was based on an occurrence of four cases of aplastic
anemia reported among 211 workers employed in a shoemaking factory during an
eight month period.  Although Gardner
relies on the Paci study (a copy of which is also in our record) to corroborate
the findings of the Yin study, the Paci study merely concludes AOur results confirm the very high SMR
[standardized mortality ratio] values for . . . aplastic anemia among Italian
shoe workers and are fully consistent with an association with exposure to
benzene in glues.@  As Gardner
acknowledges, the Paci study does not report any quantitative exposure data.








It
is not apparent from the Yin study or Gardner=s affidavit that the relative risk
figure calculated in the Yin study had a confidence level of 95%, or how the
exposure level and period identified for the narrow group of shoe factory
workers surveyed by Yin and Paci could equate to an association that has been
observed in studies among different groups such that it would continue to hold
when the effects of other variables are taken into account.  See Havner, 953 S.W.2d at 727.  Without a 95% confidence level and an
association observed in workers outside the shoe industry, the Friases= expert testimony does not satisfy
the Havner requirements for 
scientifically reliable evidence of general causation regarding the
level and period of exposure to benzene necessary to cause aplastic
anemia.  Therefore,  we overrule the Friases= first issue.

                                                              Specific
Causation

As
an alternative ground for our holding, we also address the legal sufficiency of
the Friases= evidence of the level and length of
Jesus=s benzene exposure while working at
the refinery.  Apart from the abstract
characterizations regarding conditions at the refinery, such as Afrequent contact@ with and Aregular use@ of benzene containing products, Asignificant vapor hazard,@ and Adangerously high@ levels of benzene exposure, the only
evidence attempting to quantify Jesus=s exposure is the concluding
paragraph of Rose=s affidavit:

The
available information supports the conclusion that [Jesus], during the course
of his work as a No. 2 dockman[[9]]
[from 1976 to 1994] . . . was consistently exposed to benzene levels in
the 10 to 20 ppm range . . . and that he had regular exposures above 100
ppm (sampling, disconnecting, and draining lines).  Occasional peak exposures of hundreds
of ppm and, in some cases, approaching 1000 ppm were experienced during washing
of the docks and tools with benzene, benzene spills, product sampling, and
unusual weather conditions (e.g., no wind).








(emphases
added).  Even assuming this to be the
most precise and comprehensive conclusion that can be reached based on the
limited data available, such indefinite terms as Aconsistently,@ Aregular,@ and Aoccasional@ leave the frequency (i.e.,
hourly, daily, weekly, monthly, etc.) and duration (minutes, hours) of
exposure, at any single exposure level and in total, subject to wide variance
and thus largely open to speculation.  Therefore,
even if the Friases= evidence of general causation was scientifically reliable to
show, for example, that the level and period of exposure to benzene necessary
to cause aplastic anemia was as reflected in the Yin study, their evidence of
specific causation would be legally insufficient to establish that Jesus had
actually been exposed to that level for that period.  Therefore, we overrule the Friases= second issue and affirm the judgment
of the trial court.

 

 

 

/s/        Richard H. Edelman

Justice

 

 

 

 

Judgment rendered
and Opinion filed May 15, 2003.

Panel consists of
Justices Anderson, Edelman, and Seymore.











[1]           Because
it is not necessary to our disposition of the appeal, we do not address
appellees= third ground for summary judgment, regarding the
evidence to rule out other causes for Jesus=s
aplastic anemia, or the Friases= challenge to that ground.





[2]           In the context of a
no evidence motion for summary judgment where, as here, expert evidence relied
upon by the nonmovant is objected to by the movant based on reliability, the
evidence must be both admissible and legally sufficient to withstand the no
evidence challenge.  Therefore, contrary
to the parties= arguments in this regard, there is no issue
here of which standard of review to apply (abuse of discretion or legal
sufficiency) because both must ultimately be satisfied.  Moreover, because we cannot, as a practical
matter, envision a situation in which expert testimony would be reliable enough
to be admissible or legally sufficient, but not the other, we believe that the
decision reached on reliability will produce the same disposition, regardless
whether it is viewed from the standpoint of admissibility or legal sufficiency.





[3]           The
Friases do not contend that they requested, or were denied, either a
continuance or hearing to further develop the reliability of their expert
testimony.  See Tex. R. Evid. 104(a).





[4]           In
many toxic tort cases, direct experimentation cannot be done, and there will be
no reliable evidence of specific causation. 
Havner, 953 S.W.2d at 715.





[5]           ARelative risk@ is the
ratio of the incidence of the disease among the exposed population to its
incidence among the general, or control, population.  Havner, 953 S.W.2d at 721.  The Aconfidence
level@ reflects the percentage of instances in which the
numerical results of a study would fall within a particular range of relative
risk (the Aconfidence interval@) if the
study were repeated numerous times.  See
id. at 723.  In addition, if, at a
95% confidence level, the lower level of the confidence interval is 1.0 or less
(regardless of the upper level), the results are statistically insignificant
because a 1.0 relative risk suggests no greater incidence of the disease in the
exposed population than in the unexposed. 
See id.





[6]           See,
e.g., Indus. Union Dep=t, AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 617 (1980)

(APersistent exposures at levels above 25B40 ppm may lead to blood deficiencies and diseases

of the blood-forming organs, including aplastic
anemia, which is generally fatal.@)





[7]           The qualifications
of Gardner and Rose as experts in their respective fields are not disputed in
this appeal.





[8]           It is
not apparent how the exposure level of 1035.6 mg/m[3] set forth in the
study translates into the 44 ppm stated by Gardner.





[9]           Rose
acknowledged that, although it was more likely than not that Jesus also
experienced significant exposure to benzene while he had worked as a laborer,
pipefitter, and sampler, it was not possible to more specifically characterize
that exposure based upon the information available.